UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:05CR 175 JCH |
| | ) | |
| JUAN DE JESUS ABARCA, | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Defendant filed Defendant's Motion to Suppress Evidence (Document #19). The government

filed Government's Response to Defendant's Motion to Suppress Evidence (Document #21).

Following an evidentiary hearing, the defendant filed Memorandum in Support of Defendant's Motion

to Suppress Evidence and Statements (Document #30), and the government filed Government's

Response (Document #33). The government filed its Supplement to Government's Response

(Document #35), and the defendant filed his Reply Memorandum (Document #36).

### Statement of Facts

There is little, but some, dispute about the basic facts, as contained in the following summary.

Differences in these and additional facts will become clear in the discussion to follow.

On December 2, 2005, at approximately 12:49 A.M., defendant was traveling in a gold 1999

Dodge Durango northbound on Interstate 55 near the 60-mile marker. Sergeant R. J. Sanders of the

Missouri Highway Patrol observed the vehicle passing a tractor-trailer while he was parked on the

northbound shoulder of Interstate 55. Sanders then pursued the vehicle for displaying an unreadable

license tag. As Sanders caught up to the vehicle, he paced the vehicle traveling 75 miles per hour in

a 70-mile-per-hour speed limit zone and checked the vehicle by radar which indicated a speed of 74 miles per hour. Sanders reported that as he was checking the vehicle's speed and was within 50 feet of it when he was still unable to read the registration on the vehicle. Sanders then stopped the vehicle for traffic violations on the northbound shoulder near the 63-mile marker.

Sanders exited his patrol car and walked to the left side of the vehicle. Sanders noticed the vehicle had a cardboard Illinois Temporary License (number 312F080) which was affixed with a layer of plastic tape covering the front. As Sanders walked to the driver's window, he observed the vehicle contained two occupants, a white female driver and a white male passenger. Sanders informed the driver of the alleged traffic violations and asked for her driver's license and registration. The driver was identified by an Illinois license as Maria S. Rios, date of birth October 2, 1984. She also handed Sanders an insurance paper listing the vehicle and the insured as a Susan Abarca. Sanders noticed three cellular telephones in the driver's console and a radar detector located in the windshield. Sanders reported that both the driver and the passenger were very nervous and would not make eye contact with him. The officer characterized the occupants as "fairly startled by the traffic stop, a little more than what would be under a normal traffic stop." Sanders then asked the driver to exit the vehicle and come back with him to the patrol car.

After seating Rios in the patrol car, Sanders approached the passenger for identification. The passenger was identified by an Illinois license as Juan D. Abarca, date of birth July 20, 1978. Abarca informed Sanders the vehicle belonged to his wife. Abarca told Sanders the driver, Maria Rios, was a friend of his and they had driven from Carbondale, Illinois, to visit a friend of his in Memphis, Tennessee. Sanders related that Abarca continued what he described as nervous behavior, that he would not make eye contact during the conversation and was rubbing his hands on his legs as he was

giving basic information about the vehicle and his trip. Paperwork on the vehicle revealed it was purchased on November 23, 2005, by Susan E. Abarca and Juan D. Abarca.

Sanders then returned to his patrol car and began making computer inquiries on the vehicle and Rios's and Abarca's licenses. At this time Sergeant Sanders began to issue a warning to Rios for the speed and registration violations. Officer Sanders alleged Rios continued her nervous behavior, stating she would not make eye contact with him and could not sit still in her seat. When Sanders asked Rios about her trip, she informed him she went with Abarca from Carbondale to Memphis and was returning back to Illinois. She stated they went there to visit some friends of theirs. Sanders asked Rios about where they were coming from. Ms. Rios could not provide further information and then stated it was his (Abarca's) friend and motioned to the front windshield of the patrol car to the other vehicle. Ms. Rios changed the subject and began asking questions about the trooper's computer. After answering the questions, Sanders again asked Rios if she could tell him where or whom they had visited in Memphis, Rios changed her story and informed Sanders they had gone to a restaurant in Memphis and mentioned nothing about visiting a friend. Sanders alleges he became suspicious due to his observations and both Rios's and Abarca's statements and their nervous behavior.

Sanders then contacted Abarca again at the passenger window and informed him there were some discrepancies with his trip. Sanders asked Abarca where exactly he was coming from in Memphis. Abarca could not confirm anything as far as a person or where or from whom they were coming in Memphis.

Sanders then returned to his patrol car and finished the warning for the registration and speeding violations. A computer check revealed the vehicle's registration was not on file (which defendant disputes), Rios's license was valid and Abarca's license was suspended in Illinois.

Sanders then informed Rios he noticed several discrepancies with her trip and asked if she was transporting any illegal drugs or weapons in her vehicle. She said no. Sergeant Sanders asked if he could search her vehicle and its contents. Rios stated "Yes" he could search. Sanders then contacted Abarca at the passenger door of the vehicle and informed him that there were several discrepancies with his trip and asked if a search could be conducted of his vehicle and its contents. Sanders testified Abarca asked if he needed a warrant or piece of paper to search the vehicle. Sanders stated he informed Abarca a warrant was not needed, however, he did need his permission to search. Sanders then informed Abarca he had already asked Rios and was asking him for permission to search the vehicle and contents as well. Sanders alleges Abarca replied "Sure, go ahead." Abarca was allowed to get his coat and stood near the front of his vehicle. The defendant contests the factual basis for the consent as described by Sanders, as will later appear.

Trooper Stewart arrived at the scene and maintained security of Rios, who was sitting in Sanders's car while Sanders conducted a search of the Durango. During the search of the passenger compartment, Sanders located a black "Rosetti" band satchel (book bag) on the floorboard directly behind the driver's seat next to a black purse. A search of the satchel revealed several notebooks. At the bottom of the satchel, Sanders located a plastic wrapped bundle. A closer inspection of the bundle revealed it was plastic wrapped over a vacuum-sealed bag. Inside the vacuum-sealed bag was a brown substance. He then informed both subjects they were under arrest for probable cause to believe they were in possession of a controlled substance. Trooper Stewart read Abarca and Sergeant Sanders read Rios their Miranda rights. Both Rios and Abarca acknowledged they understood.

Satterfield's Wrecker was called to the scene. Sanders then deployed his assigned Missouri State Highway Patrol Narcotic Detection Dog TAZ to conduct an interior sniff of the vehicle. TAZ alerted on the rear seat and black satchel verifying the contents as illegal drugs. Sanders then

contacted Troop E Radio and informed them of his investigation and asked for an officer with the Division of Drug and Crime Control or Southeast Missouri Drug Task Force to contact him at the Troop E Satellite in Sikeston. Sanders then transported Abarca to the Troop E Satellite. Trooper Stewart remained at the scene to maintain chain of custody on the vehicle. After Satterfield's Wrecker arrived, Trooper Stewart transported Rios and escorted the wrecker towing the vehicle to the Troop E Satellite. The vehicle was then placed in the inspection bay for processing.

Both Abarca and Rios were interviewed by SEMO Drug Task Force Officer C. Hensley. The vehicle was processed and photographed by Troopers Stewart and Sanders. It was later released to Satterfield's Wrecker.

The contents of the vacuum-sealed bag was described as a brown powdery substance with darker small particles and chunks mixed with the powder. A sample was field-tested at the Troop E Satellite using a Nartec Drug Field Identification Test Kit. The substance field-tested positive for cocaine and opiates. The item was weighed as well using digital scales. The approximate weight (still in the package) was 10.6 ounces.

The only item seized as evidence was the plastic wrapped vacuum-sealed bag containing the brown powdery substance. The item was packaged as evidence and transported to the Southeast Missouri Crime Laboratory in Cape Girardeau for further testing by Officer Hensley. Initial testing by the Southeast Missouri Crime Lab revealed the primary substance as heroin. The evidence was released to DEA Special Agent Larry Gregory pending further investigation.

Rios and Abarca were transported to the New Madrid County Jail where they were incarcerated and released to the New Madrid County Sheriff's Department. Warrants were later issued for their arrest.

## Discussion

The parties have performed extensive research into the law applicable to the fact situation in Mr. Abarca's case and the court has found the memoranda of the parties quite helpful. The filings of the parties set out their positions and aided in narrowing the issues in this matter.

### Extension of Traffic Stop Beyond the Scope of Normal Inquiry

The defendant alleges that there were no objective facts present at the scene which would support a reasonable suspicion that a crime was in progress. The defendant urges that the presence of three cellular phones and a new radar detector observed by Trooper Sanders combined with the nervousness of the occupants of the stopped vehicle and the failure by the defendant and Ms. Rios to make and maintain eye contact were insufficient to justify the trooper's extending the conversation to the point where he could request consent to search the vehicle.

The defendant argues, first, that the presence of three cellular phones on or in the center console was not significant. Many people possess personal cellular phones these days. There were two individuals riding in the front seat of the vehicle in question. The court thinks that the presence of two cellular phones would have meant very little. The court does think the presence of three cellular phones a bid odd. At least it was enough to catch the trooper's attention.

The presence of a radar detector is not something that is an unusual occurrence. The theory of some is that one can speed until the radar detector sounds an alarm, at which time the speeder can slow down. Whether that is sound strategy is not for determination here. What Trooper Sanders thought was unusual was that the radar detector was brand new, just purchased.

Like the presence of three cell phones, the radar detector could be neutral, a speeder's way of avoiding a ticket. But if one's motivation were not neutral, if someone had something to hide, it

could be an additional step one might take to avoid an unnecessary confrontation with a law enforcement officer.

The defendant, in his Memorandum in Support of his Motion to Suppress, urges that the nervousness manifested by the defendant was not "exceptional" but was more like the nervousness exhibited by anyone who is the subject of a traffic stop. Officer Sanders testified that he could tell initially that both the female and the male were nervous and would not make eye contact with him.

Sergeant Sanders testified that when he came up to the automobile, the defendant and Ms. Rios "seemed actually startled when I first made contact with them, both were extremely nervous." Sergeant Sanders indicated that when he first stopped the vehicle, neither of the occupants would look at him "which I thought was a little bit odd, because normally you'd like to see who stopped you." Central to the impression of nervousness was the lack of eye contact. He thought the nervousness was more than normal when the couple would not actually look to see who stopped them, the patch on his arm to see what department he was or to take a look at him but basically just looked away.

After Sergeant Sanders had testified, the defendant testified about his failure to look the trooper in the eye and attributed that practice to the Mexican culture in which it would be insulting and threatening to look another person in the eye. A Mexican police officer would think you were provoking him.

There was no testimony that Sergeant Sanders was familiar with this aspect of Mexican culture. Obviously in Sergeant Sanders's opinion, the failure or refusal of the occupants of the automobile to even look at him was not reasonable and aroused suspicion.

Another aspect of the defendant's behavior which the trooper thought was unusual was the defendant's "rubbing his hands on his legs." Mr. Abarca testified, "But I don't think there is nothing

- 7 -

wrong with me rubbing my hands when it's cold." Both the trooper and Mr. Abarca were speaking about the defendant's action when he was sitting in the car on the passenger's side when the window was rolled down.

The primary bases for reasonable suspicion are a police officer's personal observations. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Courts afford considerable deference to the observations and conclusions of the police, reasoning that an experienced officer can infer criminal activity from conduct that seems innocuous to a lay observer. United States v. Arvizu, 534 U.S. 266, 277 (2002); Ornelas v. United States, 517 U.S. 690, 700 (1996). Although an officer may not base a reasonable suspicion on isolated or minimal instances of innocent activity, Reid v. Georgia, 448 U.S. 438, 441 (1980), a collection of several apparently innocent activities may cumulatively create the requisite reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9 (1989). "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) quoting United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir. 1998), "An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants." Sanchez, at 975, quoting United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004).

In his listing of the items which aroused Sergeant Sanders's suspicions, the defendant does not mention the discrepancies in the stories of Ms. Rios and Mr. Abarca.

When Sergeant Sanders approached the person sitting in the driver's seat of the Durango, he asked Ms. Rios for her driver's license and registration. Ms. Rios provided her driver's license, which was valid, and provided proof of insurance, which was in the name of Susan Abarca. He asked Ms. Rios to come back to his patrol car and asked her to be seated while he went back to talk to Mr.

Abarca. The defendant told the trooper that the vehicle was owned by his wife. He had borrowed the vehicle, that he and his wife were separated and were waiting on a divorce. Mr. Abarca gave the officer the registration for the vehicle which showed that the vehicle had been purchased only nine days previously. Mr. Abarca said that Ms. Rios was just a friend.

Sergeant Sanders returned to his police car and started making computer inquiries as to the validity of the drivers' licenses, the registration and started to write out a warning ticket for the speeding and registration violations. While he was doing this, the trooper asked Ms. Rios where she and Mr. Abarca were going, where they were coming from, who was in the vehicle with her and who the vehicle belonged to.

At first, Ms. Rios told Sergeant Sanders that she and Mr. Abarca were coming from Carbondale and going to Memphis to visit some friends of theirs. (Tr. 14) She corrected herself and said that it was actually his friend, meaning Mr. Abarca's friend, that they were visiting. When the trooper asked a little later the names of the friends, Ms. Rios immediately changed the subject and asked questions about the mobile computer and told the officer she was a student at SIU-Carbondale. Officer Sanders answered Ms. Rios's questions and then asked her again if she could tell the trooper where they were coming from in Memphis. She changed her story somewhat and told Sanders they were coming from a restaurant and did not mention anything about a friend. Earlier, Mr. Abarca had said they were coming from Memphis where they had visited his friend.

After speaking with Ms. Rios, Sergeant Sanders returned to Mr. Abarca and told him that there were some discrepancies concerning the trip and asked Mr. Abarca if he could tell the officer exactly where he was coming from in Memphis, and Mr. Abarca could not confirm anything as far as a person or where or from whom they were coming in Memphis. (Tr. 15) When Sanders asked

for a name, the defendant did not answer. "There was just not a direct answer on anything." (Tr. 15-16)

Officer Sanders returned to Ms. Rios and asked her whether she was transporting any illegal drugs or weapons in her vehicle. She said no. The trooper then asked if he could search the vehicle and its contents, and she said yes. Trooper Sanders then went up to Mr. Abarca, who was still in the Durango, and told Mr. Abarca that he noticed some discrepancies concerning the trip and asked if he was transporting any illegal drugs or weapons in the vehicle. Mr. Abarca stated no. The officer then asked if he could search the vehicle and its contents, and Mr. Abarca said, "Well, don't you need a warrant or a piece of paper or something like that?" (Tr. 17) Officer Sanders's response was basically that "No, I didn't need that piece of paper or a warrant for a consent, but I did need his permission." The trooper then testified that "He basically told me, 'sure, go ahead.'" While testifying, Officer Sanders checked his report to make sure that those were the words spoken by Mr. Abarca and found that they were.

In the meantime, Officer Sanders, when Ms. Rios had given permission to search, had called for backup and a second trooper arrived. In the passenger compartment behind the driver's seat, Sergeant Sanders found a leather-type book bag and underneath the books was a "plastic wrapped type bundle." (Tr. 19) Inside the vacuum sealed bag was kind of a brown powdery substance with some darker chunks and specks of something that Officer Sanders identified as a controlled substance. At that time, he placed both Mr. Abarca and Ms. Rios under arrest. Officer Sanders testified that both were immediately read their <u>Miranda</u> rights. The second officer, Trooper Stewart, read Mr. Abarca his <u>Miranda</u> rights and Trooper Sanders read Ms. Rios her <u>Miranda</u> rights.

Trooper Sanders described the accumulation of suspicious items on cross-examination:

> I think the fact that the initial nervousness from the start, the cell phones, the registration, the fact that his wife was letting him borrow a car, the fact that she had

changed her story on me at least twice, the vagueness of how he told me where he was coming from. You put all that together and then their nervous behavior that they acted throughout the stop, and I thought something was wrong with the trip.

(Tr. 39).

As the Sanchez case says, "An officer may also question a vehicle's passengers to verify information provided by the driver and conflicting stories may provide justification to expand the scope of the stop and detain the occupants." 417 F.3d at 975. An experienced officer can infer criminal activity from conduct that seems innocuous to a lay observer. United States v. Arvizu, 534 U.S. at 277.

Officer Rick Sanders had worked with the Missouri State Highway Patrol for over sixteen years. He had attained the rank of Sergeant. He was assigned as a Zone Commander of Zone 9 in Troop E in Southeast Missouri. He is the only state canine officer of the Missouri Highway Patrol in Troop E.

The court finds that Trooper Sanders was qualified by training and experience to determine at what point what would appear to be innocuous to the untrained lay person becomes suspicious activity indicating to an experienced officer that criminal activity may be taking place. Illinois v. Wardlow, 528 U.S. at 124; United States v. Arvizu, 534 U.S. at 277; Ornelas v. United States, 517 U.S. at 700; United States v. Sokolow, 490 U.S. at 9. The court further finds that Trooper Sanders pointed to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggested that criminal activity was occurring. Terry v. Ohio, 392 U.S. 1, 21 (1968). The court further finds that the requirements of the Fourth Amendment were satisfied by Sergeant Sanders's reasonable suspicion that criminal activity was taking place which resulted in Sergeant Sanders's detaining the defendant beyond the time required to investigate only the traffic stop.

The government has made an analysis of other cases from the Eighth Circuit in which the Court of Appeals found that there were specific facts present during a traffic stop which allowed the stop to be expanded, resulting in arrests. United States v. Linkous, 285 F.3d 716 (8th Cir. 2002); United States v. Martinez, 168 F.3d 1042 (8th Cir. 1999); United States v. Bloomfield, 40 F.3d 910 (8th Cir. 1994). (Government's Memorandum, Document #33, pp. 5-6)

The government refers to and sets out cases in which detentions for much longer periods of time than occurred in the instant case were supported by articulable factual circumstances. (Document #33, p. 5)

### Consent Voluntarily Given?

The defendant alleges that even though he said "Okay" when asked if Trooper Sanders could search his vehicle, his consent was not voluntarily given.

The defendant sets out the factors listed in United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990), but does not continue and supply the facts of this case in connection with those factors. The defendant states the listed factors only. The court will comment on those factors:

(1) the defendant's age was 27 at the time he was stopped; he was an adult;

(2) the defendant declined to be interviewed by the Pretrial Services Officer so the court does not have as much information about his education as it might otherwise; on cross-examination, the defendant testified that he went to the eleventh grade in Mexico and studied English for three years while in junior high school; the defendant had no trouble communicating with the officers who interviewed him; he gave no indication that he had a deficient intelligence; many of his actions, such as changing seats with Ms. Rios when stopped by the trooper because he knew his driver's license was suspended, demonstrated an active intelligence;

(3) there was no indication that the defendant was intoxicated or under the influence of drugs during the encounter;

(4) the defendant admitted that he had the right to refuse consent to the search of the vehicle (Tr. 72-73);

(5) the defendant had been previously arrested and was acquainted with the legal system; in 2002, he had been sentenced to ninety days probation as a convicted unlicensed driver; the same year he was convicted of aggravated battery in Jackson County, Illinois, and was sentenced to 24 months probation; the same year, 2002, he was convicted of driving while his license was suspended.

Reviewing the environmental factors of the stop as proposed by Chaidez:

(1) the defendant was detained for a relatively short time, 18 minutes from stop to discovery of the controlled substance; the length of the stop was much shorter than those listed in the government's memorandum (Document #33, p. 5)

(2) the defendant was not threatened, physically intimidated or punished by police;

(3) the defendant did not rely upon promises or misrepresentations by the police;

(4) the defendant was not in custody or under arrest when the consent was given;

(5) he was in a public place;

(6) whether the defendant's reaction to the search was consistent with consent is a question to be determined, United States v. Jones, 254 F.3d 692, 696 (8th Cir. 2001).

The defendant urges that his gestures did not provide the officer with consent to search.

Sergeant Sanders testified that he asked the defendant if the defendant would consent to a search of the car. Mr. Abarca asked, "Well, don't you need a piece of paper or a warrant for this?" Trooper Sanders replied, "No, I don't need a piece of paper or warrant for consent. I've asked Ms.

Rios's permission to search. But I do need your permission before I can search." Mr. Abarca responded, "Sure, go ahead."(Tr. 41) Officer Sanders wrote those words in his report.

Mr. Abarca disagreed with the trooper's version of their conversation. Mr. Abarca testified that after he told Sergeant Sanders that he thought the trooper should have a warrant or something like that to search his car, Sergeant Sanders responded, "I don't need any kind of that, I just need to search your car. If you don't want me to, I just need to bring the dog and search it." (Tr. 69) Mr. Abarca testified that his response was, "And I just sat back and all I say was, 'okay.'" The officer then asked if Mr. Abarca had another jacket, and Mr. Abarca responded that he did. The officer told him to get it and to step out of the car. Mr. Abarca testified, "So I didn't say anything else." (Tr. 69)

When asked if he told Trooper Sanders "Sure, go ahead" about searching, Mr. Abarca testified, "I don't usually use those words." When asked what he did say, Mr. Abarca responded, "I say okay." (Tr. 70) When asked if he made any gestures, shrugged his shoulders or did anything with his hands when he was speaking to Sergeant Sanders about the search, the defendant testified he "Just leaned back and 'okay.'" His attorney asked, "What you just showed me; that is, you sort of frowned and shrugged your shoulder?" Mr. Abarca responded, "Yeah, that's what I did." (Tr. 71)

It is the defendant's position that when the defendant said okay to the search, he sat back and shrugged his shoulders, this was an indication that he did not consent to the search.

Mr. Abarca's account of his conversation about the drug dog indicated that when the defendant told the officer that he thought the officer should have a warrant or something like that to search his car, Sergeant Sanders told him, "I don't need any kind of that, I just need to search your car. If you don't want me to, I just need to bring the dog and search it," implying that he would bring the drug dog and search the car.

In rebuttal testimony, Sergeant Sanders did not recall whether there was conversation about the drug dog. If he had said anything about the drug dog, from his past experience, if someone had a problem with consent, he would request them to stand out of the car for safety and conduct an exterior canine sniff which he has done in the past. However, he did not recall saying any of that to Mr. Abarca. (Tr. 89) The sniff would have been outside the car, never inside. It would have been an exterior sniff and if the trooper had received a canine alert, an indication, then he would have gone ahead and searched, but only on alert and exterior indication. (Tr. 88-89)

In point of fact, the drug dog, although present in Sergeant Sanders's patrol car during the stop and conversations leading up to the search, was not brought out of the patrol car until after the controlled substance was found and Mr. Abarca and Ms. Rios were arrested. (Tr. 89)

An exterior sniff by a drug dog is not a search, United States v. Place, 462 U.S. 696, 707 (1983); United States v. Gregory, 302 F.3d 805, 810 (8th Cir. 2002); and in view of the reasonable suspicion already supported by articulable facts, extension of the stop to encompass an exterior sniff was authorized, although in this instance it did not take place.

The defendant claims the threat of the use of a drug dog to search the interior of the automobile (which is contradictory to the testimony of Sergeant Sanders) would have been like a hammer forcing the defendant to consent. Which is true, the trooper's statement or the defendant's?

The court has already reviewed Sergeant Sanders's credentials and experience in connection with determining whether extension of the stop to encompass further questioning was reasonable. The court is impressed by the statement that although the trooper may make five to fifteen traffic stops per work period when he is on duty (Tr. 29), during the year 2005 (for almost the whole year since the stop was in December 2005), the officer had made five drug seizures as a result of traffic stops. (Tr. 30) This officer was not one who was bent on making drug arrests at any cost, even at

the cost of a defendant's rights. This officer did not immediately use his drug dog. The whole time of the stop until after the heroin was found, the dog was in the trooper's patrol car and stayed in the car, again, until after the defendant and Ms. Rios were arrested. (Tr. 90)

The sergeant was very particular in trying to recall the sequence of events during the stop. When asked on which visit to talk to Ms. Rios he had asked about the transportation of illegal drugs, he made sure the cross-examiner understood that it was his third trip to talk to Ms. Rios that that question was posed, when defendant's attorney thought the question was asked on the second trip to talk to Ms. Rios. (Tr. 38)

The words used by the defendant to give consent in Sanders's account, "Sure, go ahead," were written down in the trooper's notes that night and went into his written report (Tr. 87) which is an indication of his report's reliability.

When asked if he had told the defendant if the defendant had the right to refuse to consent to the search of the car, Trooper Sanders stated that he had not told the defendant of his right to refuse. (Tr. 21) If Sergeant Sanders were lying in order to bolster his description of the events which occurred, he could have claimed that he told the defendant that he had the right to refuse consent. It would have been his word against the defendant's. This is a further indication to the court that Officer Sanders was telling the truth.

The court has already considered the defendant's criminal record in connection with his familiarity with the criminal legal system. The defendant was not quite so exacting as was the trooper in his account of what happened during the stop. At first, Mr. Abarca said that Trooper Sanders talked to him only one time. (Tr. 67) Later, he stated that there was another time when Sanders asked about searching. (Tr. 68) When asked by his attorney to describe the conversation that he had with

the officer in detail, he then combined the conversations which Officer Sanders had clearly distinguished.

The defendant denied that he was in possession of the controlled substances (Tr. 50) but at the same time said the only other person in the car, Ms. Rios, had nothing to do with it. (Tr. 55-56)

The defendant testified that Ms. Rios was driving when the car was stopped. (Tr. 65) On the other hand, Ms. Rios told Officer Hensley that after the car was stopped, the defendant told Ms. Rios to change places with him. (Tr. 54) The defendant's driver's license was suspended. If Ms. Rios is to be believed, the defendant's telling her to change places so he would not be arrested for driving with a suspended license was clearly an action meant to deceive.

The parties agreed that the court could review Exhibit #2, which was a recording of the interview by Officer Hensley of the defendant at the Highway Patrol Satellite Station in Sikeston. The purposes of having the court listen to the CD was to show how fluent the defendant is in the use of English and the exchange which took place between Officer Hensley and the defendant concerning the waiver of <u>Miranda</u> rights. In the first part of that tape, which is the part the court listened to, the defendant claimed that he did not know the heroin was present in the car. The court finds this hard to believe, but it also supports Trooper Sanders's version of the defendant's consent to search in that, if the defendant claims he did not know the controlled substance was there, he might well have consented to the search as alleged by Sergeant Sanders.

The court accepts as true the testimony of Sergeant Sanders concerning the consent to search.

In his memorandum, the defendant claims under his version of the exchange concerning consent between himself and Trooper Sanders that his saying okay, shrugging his shoulders and then sitting back to think should be interpreted as a refusal to give full consent, which the defendant argues was not complete consent and, therefore, was not consent.

The court finds that Sergeant Sanders reasonably believed that the defendant gave his consent and that the consent was voluntary. The Fourth Amendment requires only that the police reasonably believe the search is consensual. United States v. Guerrero, 374 F.3d 584, 588 (8th Cir. 2004).

Considering the totality of the circumstances present at the scene, the court finds that the defendant's consent to search the vehicle and its contents was voluntary.

## Low Fluency in English?

In his memorandum attached to his motion to suppress evidence (Document #19), the defendant argued that his low fluency in English rendered the alleged consent involuntary.

All the officers testified that the defendant had no trouble speaking English. The record shows that at the initial appearance in court of the defendant in the Eastern District of Missouri, the defendant stated that he understood and spoke English. The tape given to the court by the parties, which contained the interview of the defendant by Officer Hensley, contains a statement by the defendant that he understands the English language. The conversation carried on in the tape shows clearly that the defendant speaks English fluently and shows no lack of understanding of English.[1]

## Invocation of Right to Counsel

In his memorandum, the defendant quotes three lines from his interview with Officer Hensley which the defendant argues shows that he made a clear and unequivocal assertion of his right to counsel. The government counters with a much longer version of the exchange between Officer Hensley and the defendant which, the government says, indicates that at one point the defendant did

---

[1]On cross-examination, Mr. Abarca also demonstrated extensive technical knowledge and familiarity with the various electronic devices in the car: "In the middle was my Verizon cell phone. A 30 Verizon cell phone. And the car charger pretty much all was in the console. Inside the glove compartment there was CDs. Inside the CD cases, my cell phone, there is a Sprint one and a black walkie-talkie, Nextel cell phone." (Tr. 65)

say he wanted an attorney but that he proceeded beyond that point and initiated further discussion and waived his right to counsel.

The government has included a transcript of part of the interview, the part having to do with the question of whether the defendant asserted his right to counsel and maintained that right or whether he waived that right. The court has included that part of the transcript contained in the defendant's memorandum (Document #33) relating the exchange:

6:47 (minutes and second on the recording)

| | |
|---|---|
| Hensley: | Can I get you to sign right there? It's not saying you're guilty; it just says I read them to you, and you understand them. |
| Abarca: | (Inaudible) says I do not want a lawyer at this time, and . . . But I do want a lawyer. |
| Hensley: | Oh, you want a lawyer? |
| Abarca: | Yes. |
| Hensley: | Okay. |
| Abarca: | I do want. |
| Hensley: | Okay. That's fine. I mean . . . |
| Abarca: | Yeah. I mean. I want to . . . I want to help you guys all I can. But I know some like . . . I want to help, but all I can . . . Can we proceed on that, continue, or some stuff like this? You know what I mean? |
| Hensley: | I understand. What you have to understand is . . . |
| Abarca: | I understand your position. You are doing your job. |
| Hensley: | Like it says . . . |
| Abarca: | Print on it? You like, right there now, and sign it? |
| Hensley: | However you want to do it. You can put a big ole "x" on there if you want. I mean, really, but I want you to understand that before I can sit here and continue to talk to you, I have to know if you want an attorney or if you don't want an attorney. |

| Abarca: | I do. |
|---|---|
| Hensley: | Okay, because if you do, if you want one present, then I can't talk to you anymore. I mean, that's how . . . |
| Abarca: | (Inaudible) I already signed (inaudible) I understand my rights. I do know about my rights. I already signed it, and I'm signing . . . It's cool with me right now. Okay. It's cool with me. Why? Because I asked her to come for me and drive for me? Okay. She had nothing to do. I not fucking with this shit. She doesn't deserve (inaudible). She needs to finish her school. |
| Hensley: | The other girl in the room? |
| Abarca: | Yes. |
| Hensley: | Where I'm going with this is if you want an attorney to be present here then me and you can't . . . We can't chat like we just did. If you want to chat. |
| Abarca: | I want to help. |
| Hensley: | Okay. |
| Abarca: | And I need help. |
| Hensley: | Okay. |
| Abarca: | (Inaudible) She had nothing to do . . . |
| Hensley: | Okay. |
| Abarca: | Know what I mean? |
| Hensley: | I understand. But you have to understand we have to clear up the attorney thing before or after it's . . . Uh, you seem like you're having a problem really deciding whether you want one or you don't right now. Because you seem like you want to chat with me, and you may want one later, which you'll get one. |
| Abarca: | (Inaudible) I don't have nothing to hide. You are going to work out with me. Everything I tell you is same stuff I did. Just like I told the officers . . . (Inaudible) She knows about the law . . . (Inaudible) And I want to help you all I can to do everything I can. She is the first one in her family to go to college. |
| Hensley: | Really. |

| | |
|---|---|
| Abarca: | What can we do? Is there a way? (Inaudible) |
| Hensley: | If you're asking me what's going to happen either way, whether you have one here right now or you don't have one here, or . . . I explain the whole thing to you. If that's what you want. |
| Abarca: | Please. |
| Hensley: | If you want an attorney, then I have to stop the interview, and we'll process you through, and we'll probably get you one in the morning, or tomorrow afternoon. Then you can chat with us. If you don't want an attorney, at this time, we can chat. Talk about what's going on here with this, I guess that's cocaine he found, or . . . |
| Abarca: | Yeah, that's what I told him. Pretty much looks like cocaine. |

The court has listened to the tape containing the portion contained in the government's transcript. During that portion of the interview, Officer Hensley informed the defendant four times that if he wanted a lawyer at that time, then Officer Hensley would not be able to continue to talk to Mr. Abarca. The defendant vacillated throughout this portion of the conversation between wanting a lawyer and also wanting to help Ms. Rios, who he said was a student and did not have anything to do with what the officers found in the car. He kept repeating that he wanted to help. All of this took place after the defendant had been read the Miranda warnings. He said he understood his rights, repeated that Ms. Rios had nothing to do with it and that he wanted to help all he could and do everything he could (presumably to exonerate Ms. Rios so she could continue in school). He then asked, "What can I do? Is there a way?" At one point, after being reminded that if he wanted a lawyer now, Hensley could not talk to him. Mr. Abarca said that he had already signed the forms. He repeatedly said he wanted to help all he could, "just to get it out so she can keep going to school."

The court finds that the defendant's invocation of his right to counsel was not clear and unambiguous. As noted above, the defendant wavered between asserting he wanted an attorney and his desire to help Ms. Rios, by volunteering that he wanted to help and wanted to do anything he

could. At one point, after the fourth time he was warned that Officer Hensley could not speak to him if he wanted to have an attorney at that time, the defendant said that he did not know what was going to happen. Officer Hensley explained what would happen if he wanted an attorney there then and what would happen if he waived his right to an attorney. The defendant continued the conversation.

When Officer Hensley testified at the evidentiary hearing and reported the exchange, having told Mr. Abarca that if he wanted an attorney, then Hensley could no longer talk to him, and then Abarca told Hensley that he wanted to talk, he wanted to help, he was asked how he interpreted what Mr. Abarca had said. Officer Hensley testified, "that he was waiving his rights." (Tr. 57)

If the invocation of Miranda rights is ambiguous or equivocal, further questioning is permissible. Davis v. United States, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 2355 (1994). The Davis Court stated that to avoid difficulties of proof and to provide guidance to officers conducting interrogations, an objective inquiry is used. See Id. The Court stated, "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209 (1991). ("[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885 (1981)]")[2]

_____

[2]The holding of Davis is exemplified in the following cases: Bui v. DiPaolo, 170 F.3d 232, 238-39 (1st Cir. 1999)(continued questioning permissible because defendant's initial refusal to answer questions followed by his asking "Who said I did this?" and thus was ambiguous); Diaz v. Senkowski, 76 F.3d 61, 63 (2d Cir. 1996)(continued questioning permissible because defendant's question"Do you think I need a lawyer?" did not make clear statement invoking Miranda rights); Flamer v. Delaware, 68 F.3d 710, 725 (3d Cir. 1995)(continued questioning permissible because defendant did not make clear statement invoking right to counsel by requesting to telephone about possible representation); Burket v. Angelone, 208 F.3d 172, 197-98 (4th Cir. 2000)(continued questioning permissible because defendant's statement "I think I need a lawyer" was not an

Although the <u>Davis</u> case concerns the right to counsel under <u>Miranda</u>, "Nonetheless, every circuit that has addressed the issue squarely has concluded that <u>Davis</u> applies to both components of <u>Miranda</u>: the right to counsel and the right to remain silent. (citations omitted)" <u>Bui v. DiPaolo</u>, 170 F.3d 232, 239 (1st Cir. 1999).

In <u>United States v. Johnson</u>, 56 F.3d 947, 955 (8th Cir. 1995), the Eighth Circuit held "To adequately invoke this right [to remain silent] and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.' <u>United States v. Thompson</u>, 866 F.2d 268, 272 (8th Cir. 1989). We consider the defendant's statements as to whether they indicate an unequivocal decision to invoke the right to remain silent. <u>See id.</u>" The Court held that "Johnson never indicated a clear or unequivocal desire to remain silent." The Court set out the exchanges between Johnson and the FBI agent who began questioning him:

> The authorities repeatedly informed Johnson of his rights, both orally and in writing, and Johnson acknowledged that he understood them. When Agent Vera read the waiver portion of the form to determine if Johnson wished to waive his rights, Johnson gave no direct answer but stated indirectly through use of profanity that he did not think he could help himself by talking. Agent Vera again attempted to

_____

unequivocal request for counsel); <u>U.S. v. Posada-Rios</u>, 158 F.3d 832, 867 (5th Cir. 1998)(continued questioning permissible because defendant's question, "Might have to get a lawyer then, huh?" was not a clear statement invoking <u>Miranda</u> rights); <u>U.S. v. Hurst</u>, 228 F.3d 751, 760 (6th Cir. 2000)(continued questioning permissible because defendant's refusal to answer certain questions after expressly agreeing to answer other questions was not clear and unequivocal invocation of the right to remain silent); <u>U.S. v. Muhammad</u>, 120 F.3d 688, 696-97 (7th Cir.)(continued questioning permissible when suspect simply said "an attorney" in response to officer's reading of <u>Miranda</u> rights, when officer made subsequent efforts to clarify by asking suspect if suspect had attorney and offering suspect phone), <u>amended by</u> 120 F.3d 688 (7th Cir. 1997); <u>U.S. v. Doe</u>, 170 F.3d 1162, 1166 (9th Cir. 1999)(continued questioning permissible because defendant's question, "What time will I see a lawyer?" was not clear statement invoking <u>Miranda</u> rights); <u>U.S. v. Zamora</u>, 222 F.3d 756, 766 (10th Cir. 2000)(continued questioning permissible because defendant's statement "I might want to talk to an attorney" was not an unequivocal request for counsel); <u>Mincey v. Head</u>, 206 F.3d 1106, 1132 (11th Cir. 2000)(continued questioning permissible because defendant's statement "go ahead and run the lawyers" was an ambiguous request for counsel).

determine if he wished to waive his rights, and Johnson asked, "if I tell you anything, you're just going to use it against me later, aren't you?" (Trial Tr., Vol. 5 at 203.) Agent Vera responded affirmatively. Johnson then refused to sign any forms but agreed to talk and stated, "you guys have all the evidence against me. I don't need to make any statement. I don't need to say anything." (<u>Id</u>. at 205.) Faced with mixed signals, Agent Vera did not question Johnson about the crime but explained, "you have this opportunity to talk to me without a lawyer, to make a statement. You're the only person who can tell me about activities on January 28th of 1993." (<u>Id</u>.) Johnson then responded in more certain terms, "I know I'm going to jail for a long time, the rest of my life, I can't help myself by talking to you." (<u>Id</u>.) Johnson said nothing further, and questioning ceased.

53 F.3d at 955.

The Court found "Johnson's initial indirect and ambiguous statements fall far short of a clear or unequivocal expression of the right to remain silent." The Court concluded its discussion of the defendant's contention that his statements should have been suppressed by finding: "Following the standard stated above, we conclude that the district court did not err in denying Johnson's motion to suppress the statements he made while in custody." <u>Id</u>.

The opinion of the Court of Appeals for the Eighth Circuit, in <u>Dormire v. Wilkinson</u>, 249 F.3d 801 (8th Cir. 2001), follows the Supreme Court's holding in <u>Davis</u> and that of the First Circuit in <u>Bui</u>:

Under the governing law, questioning may proceed unless a suspect "clearly" and "unambiguously" makes known his desire to have counsel present. <u>Davis</u>, 512 U.S. at 459, 114 S.Ct. 2350. Wilkinson's question was not such a clear and unambiguous request for counsel that Ivie was required to stop his interrogation. Considering the question in context, it is not clear that Wilkinson was actually requesting the presence of an attorney when he asked "Could I call my lawyer?" Wilkinson had just asked whether he could contact his girlfriend, and Ivie had informed him that he could not. Ivie could have reasonably believed in these circumstances that Wilkinson was merely inquiring whether he had the right to call a lawyer, rather than believing that Wilkinson was actually requesting counsel. Indeed, Ivie did not prevent Wilkinson from calling an attorney, and he told him affirmatively that he had the right to call one. Supreme Court precedent does not require the cessation of questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel." <u>Davis</u>, 512 U.S. at 459, 114 S.Ct. 2350 (emphasis supplied). We conclude that the state court was not unreasonable in determining that Wilkinson's question "Could I call my lawyer?" was not an unambiguous request for counsel. Other courts have come to the same conclusion

when presented with similarly worded statements. See, e.g., Diaz v. Senkowski, 76 F.3d 61, 65 (2d Cir. 1996) ("I think I want a lawyer" not unequivocal invocation of right to counsel); Lord v. Duckworth, 29 F.3d 1216, 1221 (7th Cir. 1994) ("I can't afford a lawyer but is there anyway I can get one?" not a clear request for counsel).

249 F.3d at 805.

The court finds that Mr. Abarca did not make a clear, unequivocal, unambiguous assertion of his right to counsel. Davis, 512 U.S. at 458-59, 114 S.Ct. at 2355; Dormire v. Wisconsin, 249 F.3d 801 at 805.

For the foregoing reasons, the court finds that the Defendant's Motion to Suppress Evidence and Statements (Document #19) should be denied.

**IT IS, THEREFORE, RECOMMENDED** that the Defendant's Motion to Suppress Evidence and Statements (Document #19) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of May, 2006.